And again, it's Mary Jones, who occupied the property through 1999, 87 to 1999, who says, and that's it, on page 306 of the record of the transcripts, that she had no issue with Leon, no issue whatsoever, no issue with the properties. And so it is all of that evidence, not just from Pohl's side, but from the Williams side, that shows that there was, that it was clear and convincing evidence that Pohl occupied this property and occupied all of it through, again, 2008, although the adverse possession law says that you only have to prove that for 20 years. And so by 1999, March of 1999, before the Williams even moved in, he has proved that. The Williams used a lot of evidence that was post-April of 1999. That makes sense because, except for Mary Jones, they had no one else who could talk about or who they decided to call to testify about this, their property. But as the law says in Shirts v. Rundle, or Davis v. Haynes, 349 Illinois 2nd, 622 from 1932, and then Shirts v. Rundle's, 48 Illinois Up 3rd, 672 from the 4th District in 1997, once the right under adverse possession is vested at 20 years, then what happens after that does not matter. The Williams spent their time talking about what happened after April of 1999 when the plaintiffs had already proved their adverse possession. For those reasons, we ask that the court reverse the trial court's ruling with a remand in direction to grant that all of Parcel 1 be granted by quiet title to Mr. Pohl. Thank you. Thank you. Additional questions? Justice Bowie? At this time. All right. Thank you. You'll be given time for rebuttal in just a moment. Thank you. Mr. Schmid, are you ready to proceed? All right. You may do so. And again, please recite your name for the record for the recording purposes. Thank you, Your Honors. Counsel, may it please the court. My name is James Schmid, and I represent the defendants in Appalese, Mark and Deborah Williams. I'm going to present to the court three points in response. First, Mr. Pohl made no argument in his opening brief that the trial court's expressed findings were against the manifest weight of the evidence. Second, Mr. Pohl ignores that he bore the burden of proof on each element of his adverse possession claim and that that burden of proof is clear and convincing evidence. Third, the Williams presented evidence predating their ownership on which the trial court relied in finding that Mr. Pohl failed to meet his burden. In Mr. Pohl's opening brief, he makes no argument regarding the actual findings of the trial court. He doesn't take issue with a single one of them. First, the trial court awarded summary judgment before trial on the wrongful tree-cutting claim. Although that claim has been appealed, at least in the notice of appeal, there's no argument on that. And so we'd ask the court to affirm that. Your clients did not appeal any portion of the trial court's ruling, did they? They did not, Your Honor. When do you believe the adverse possession period began to run? Do you believe it was 71 when they started renting, or 77 or 79 when they bought the property, or 81 when they drilled the well? Or when do you believe the time starts, or if it starts at all? That's a good question, Your Honor. And we believe that was Mr. Pohl's burden to show. For all we know, it could have began, or at least pursuant to his claim, it could have began when Mr. Hansen purchased the property. And we don't know when that was, because that wasn't presented in the record. And one way that an adverse possessor can lose title is by adverse possession back to the title owner. And so when we have a case such as this, where we see there was a fence, which even if it was a decorative fence, it enclosed the area next to Mr. Pohl's residence, the area where the Williams' home was later built. But in this case, we see that the trial court spelled out its rulings in detail on the record. It filed that up with a written order. It found, for example, that Mr. Pohl's use, or the proof of the use, of the land he claims to have adversely possessed decreases as we move away from the record property line. It found that the Williams' use, including that they took down the trees that Mr. Pohl claims were on his property, was indicative of Mr. Pohl's use before they moved into their property, before the Williams' purchased. It found that the primary use of the driveway was square with the garage, with Mr. Pohl's garage, meaning it was in a direct north and south line from the garage to the road. It examined some pictures that were admitted, pictures going all the way back to the 1970s and 80s. It looked at GIS maps from as early as 1973. It relied on those to find that the driveway expanded to the east over time. It found that there was uncertainty over Mr. Pohl's use and how that use changed over time. As the court noted, it drew adverse credibility inferences from Mr. Pohl's manner while testifying, stating that he seemed confused and uncertain. All of those findings are entitled... This court should defer to the trial court regarding those findings because the trial court is the finder of fact. And Mr. Pohl bears the burden here that those findings were against the manifest weight of the evidence. Now, just to contradict an argument that counsel made, there was no testimony that Mr. Pohl cared for the raspberry bushes. There was testimony that he maliciously trespassed and cut some of them, but no testimony that he cared for them. I think it's also important to talk about some of the things that Mr. Pohl didn't do. Now, when he first moved into the property, there was a fence, and that fence enclosed what we'll say the neighboring property where the Williams' home was later built. So whether it was a decorative fence or not, the fence was there. It was in an L-shaped, enclosing the property that Mr. Pohl claims to have possessed. And he says that his predecessor in title, Mr. Hansen, showed him that the property line was through a rock, which was on the other side of the fence. Well, first of all, that's nonsensical. But second of all, Mr. Pohl never removed that fence. Someone else removed that fence. Who? He doesn't know. Later, there were some trees planted, and those trees were in a similar L-shape along South Muhammad Road to the east of Mr. Pohl's property, on the property that later belonged to the Williams' where their home was built, and turning to the north, again in an L-shape. And Mr. Pohl testified he didn't know who planted them. Now, at trial, he said, well, it might have been my wife. But then he was impeached with his deposition testimony in which he testified, I have no idea who planted them. And those are planted on property that he claims he adversely possessed. He claims that that was the property within which his predecessor in title showed him. Part of the Williams' was built in their house, and I think they built it in 87 and moved into it in 88. That property there was just field and weeds and undeveloped property. Is that right? That's accurate. It was actually the Williams' predecessor in title, the Joneses, who built the property. But, yes, prior to that, it was weeds. It was a field. I believe it may have been a sportsman's club at some point further back. But that area where the Williams' house is, where the Joneses built, was a field. That is correct, Your Honor. You think there's an argument that the adverse possession did not start until 88 when the family moved into the newly built house, or do you think there's an argument it starts sooner than that? If we're talking about Mr. Pohl's adverse possession, I believe, you know, we don't believe it really ever started at all. There was the fence there. There were the trees there. So we don't believe he proved any of the elements of adverse possession. Nonetheless— Certainly he does to the well because he drilled a well in 81, and that was on property that deed-wise was not his, but it's off his property, correct? That is accurate, Your Honor. And so, you know, that could have potentially been an easement or something else. But the trial court ruled that he did adversely possess that area of the wellhead line, and the Williams' respect that. And they respect that in part because the trial court made such a detailed ruling, including findings of fact. This case was tried before a bench, as the court knows. But regarding that well, I'd also note Mr. Pohl claims that he's always used the driveway, we'll call it a two-lane driveway. The garage itself, as the court can see from the pictures, it's only a one-stall garage. So the driveway initially, the trial court found that the driveway initially was, I'm trying to remember the words, that it was straight from the, even with the garage. Now I'll note the well is only, I think, 3.6 feet off of the garage, to the east of the garage. And so if we really think about that, the well would have been drilled essentially in the middle of this alleged two-lane driveway. That doesn't make sense either. Regarding my second point, Mr. Pohl ignores that he bore the burden of proof, and that that burden of proof was clear and convincing evidence. All presumptions are drawn in favor of the record titleholder. An adverse possessor must prove that he continuously possessed the property, that he possessed it in a hostile or adverse manner, that he actually possessed it, that he possessed it openly, notoriously, and exclusively, and that he did so under a claim inconsistent with the rights of the true owner. Although not an element, he must also show the precise boundary line to which he claims. Now here the trial court found that he failed to show that he continuously possessed the property. And I think when the court looks at it, that makes sense. First of all, it's entitled to deference because that was the trial court's finding of fact. But second of all, it makes sense when the court considers that there was a fence enclosing the opposite property, and Mr. Pohl claims that his predecessor in title showed him a boundary line on the other side of that fence. He didn't remember exactly where in relation to the fence, nor did his daughter Linda, but it just doesn't make sense. He also testified he didn't know who planted the trees on his property. That's not continuous possession. When someone else comes onto your property, there's already a fence there, someone else comes onto your property to take it down, someone else comes onto your property to plant trees, and if we look later in time to when the Williamses were living there, someone else takes the trees down. And there's a general non-interest to that. That was a finding by the trial court. There were pictures that showed that sometimes there was a car there, sometimes there was not. That's not continuous possession. Regarding the hostile or adverse requirement, again, we have the fence. I keep coming back to the fence. There was a fence put there. He doesn't know by who. Taken down by someone. He doesn't know who. Then enclosed the opposite property that he claims to have possessed. With regard to the cars being there or not there, there was testimony that if somebody had a party or a gathering or something, both sides parked cars on that expanded driveway, did they not? That's accurate, Your Honor. Both sides parked there, and I think also both parties testified that when neighbors needed some extra parking, they would call both sides to ask. But that is indeed correct. The Williamses, when they would have a family gathering or something of that nature, when the kids are home from college, the Williamses would park or their children would park on that area so that there was more room in their driveway for guests who were coming over. And there was no testimony in the record that Mr. Paul ever excluded anyone. He didn't build a fence, and that's not necessary, but that would be something that would show that he hostily possessed this property, and there was, again, no testimony that he excluded anyone. Regarding actuality, this is another element that the trial court found Mr. Paul failed to prove. Now, I argued below and I argue here that the only thing he did was mow, and that's insufficient under the case law. Mowing alone is insufficient. But even if it was, again, I bring the court back to the fact that this was Mr. Paul's burden to show that he actually possessed this property, and the trial court found he didn't. He bore a high burden in the trial court, clear and convincing evidence, and he bears a high burden here today, that he has to show that the trial court's finding was against the manifest weight of the evidence. I submit to the court that he can't do that on the actuality prong. Regarding the open, notorious, and exclusivity prong, this is another one, the third one that the trial court found in the Williams' favor. They found that Mr. Paul failed to prove this prong, this element, and that's supported by the evidence. Someone else planted trees on the property. Someone else took the fence down, the fence that was there when he moved in. Regarding the claim inconsistent with that of the true owner, I come back to the fence. The fence was there, and the fence was to exclude. Maybe it was decorative, maybe it wasn't, but that was to exclude other people. It wasn't for Mr. Paul or his predecessor didn't build that. Someone else built that, and it was, if you look at it, to exclude people out of that property, the opposite property, the property that Mr. Paul claims that he adversely possessed. Regarding the precise boundary line, there was conflicting testimony on that. We heard from Mr. Meyer, the surveyor, who said, well, the line that Mr. Paul showed me, it was canted, it was slanted. But then we heard from Stephen Pohl, Mr. Paul's nephew, who said, no, it was straight up and down. So that conflicted. Regarding its relation to the fence, during deposition testimony, with which Mr. Paul was testified, he testified in his deposition that there was a fence post, and then right through the fence post was the rock, and you go from there, that's the boundary line. But during the course of trial, he said, well, there's just the rock. And I said, well, what about the fence post? Didn't you testify that there was a fence post, and that was part of the boundary line? Well, I was wrong. And so we see internally inconsistent testimony, as well as testimony that's inconsistent with each other. Finally, the Williams presented evidence from before their ownership, on which the trial court relied in finding that Mr. Pohl failed to meet his burden. Again, Mr. Pohl bore the burden here, by clear and convincing evidence. He had to show that he adversely possessed the property. The Williamses didn't have to disprove his claim. I don't think there's any law that supports the idea that just because somebody's been living there for 40 years and says they adversely possessed it 20 years ago means they did, and the court has to believe their testimony. No, the court does have to, and I think Your Honor was asking about this. The court does have to find that that testimony is credible. We can't just go about giving anyone who claims they adversely possessed property 20 years ago that property. That person claiming adverse possession has to prove it. And here, the trial court found he failed to do that, and there's good reason for that. Mr. Pohl's testimony contradicted his deposition testimony. He called his deposition testimony wrong. He had no idea who planted the trees during the course of his deposition, but during trial, well, it might have been my wife. The Williamses of the surveys deserves greater weight than the other. There was a survey done by, I think, Mr. Meyer, and then there's a Kyle Schultz who also testified about a survey he conducted for your clients. What's the difference in the surveys, or should one be given more weight than the other? I don't believe there is a difference, Your Honor. I believe the only difference is that Mr. Meyer was called in,  but the only way that this property line is shown was because in 2018, Mr. Pohl hired Mr. Meyer and told him, here was where my predecessor showed me the title is. Please put a pin. I'm a little confused on the facts. Is Mr. Meyer the guy who did the survey who said he had been there when Mr. Hansen laid out the subdivision and he didn't remember talking about parcels one or parcels two? That is accurate, Your Honor. So Mr. Meyer was the surveyor hired by Mr. Pohl in 2018, and in 2018, he went out and he said, I found no, there was nothing in the land records, and there was no monumentation indicating the existence of this parcel one. But Mr. Pohl showed him, yep, Mr. Hansen showed me right here through the rock, and it goes, it's on a slanted line, as the court can see from the survey, a slanted line to the property line between the Williamses and the Leleys, who are their neighbors to the north, and then it cants a little sharper to the west until it gets to the backside of Mr. Pohl's property line. And first of all, that doesn't make sense because the boundary line between the Leleys and the Williamses or the Joneses didn't exist at the time that Mr. Hansen would have shown Mr. Pohl the property line. But on top of that, as the court just noted, when I examined or cross-examined Mr. Meyer, I asked him, well, didn't you help subdivide Hansen's, I believe it was called Hansen's subdivision two? Yes, I did. And when you were there, did Mr. Hansen indicate to you anything about the existence of parcel one or parcel two? No, he didn't. And he was marking the boundary three feet away from where this alleged boundary line existed. And he had no recollection of that. Mr. Hansen had not indicated that to him. That also contradicts with Stephen Pohl's testimony that the boundary line was a straight line north and south. That's not what's indicated on Mr. Meyer's survey. And Mr. Schultz's survey shows the same thing. It does show the existence of parcels one and two only because Mr. Meyer had laid the monumentation to mark those. And monumentation are the iron pins that surveyors put into the ground so that they can later find them. But he found no evidence of that in the land records. In the trial court, there were also many photos that were admitted. And I think counsel referenced some of those photos from the 1970s, from the 1980s. These are photos of Mr. Pohl, photos of Mr. Pohl's family, photos of his garage, photos of the fence. The trial court looked at those. It looked at GIS maps. I think the earliest one was 1973, which shows, as the trial court found, that the driveway expanded. It was when the trees came down, as the court noted, that the driveway expanded over to the east. Again, the court drew adverse credibility inferences about Mr. Pohl and the way he testified. How much weight can we give to the GIS maps? Because those are created basically for the assessor, correct? And who knows who puts the boundary lines on the GIS maps? What are they based on? Well, they were taken from the county website. I will say that they were admitted without objection. And so the trial court, I believe, did rely on those. And if Mr. Pohl wanted to object, he could have objected. He failed to do that. And so the trial court, this court should give the same weight to them that the trial court gave to them, because the trial court relied on those to the extent it did, and that reliance is entitled to deference here in the appellate court. And that gets back to the detailed findings of fact that were made on the record. Many of those findings were detailed in a written order, and those findings are consistent with the lack of evidence that was presented by Mr. Pohl. They're consistent with the conflicting testimony presented by Mr. Pohl and by his witnesses. They're consistent with the credibility findings made by the trial court. They're consistent with the evidence presented by the Williamses. And so, Your Honor, the Williamses believe this appeal is wholly unwarranted, and they ask this honorable court to affirm the trial court. Thank you. Thank you. Questions for Justice Booey? No questions. Justice McHaney? No questions. All right. Thank you. I believe under the rules for this proceeding you have five minutes for rebuttal. Is that your understanding? Yes, it is. Thank you. Thank you. Pohl had the burden of proof by clear and convincing evidence that he possessed the property for 20 years and by clear and convincing evidence that that property possession was continuous, hostile or adverse, that is an assertion of ownership, actual, open, notorious, and exclusive, and under claim of title inconsistent with that of the true owner. He did that, not just for 20 years, but actually for probably close to 30 years. And the suggestions by counsel that he failed to do that by clear and convincing evidence as to each of the five factors and as to the actual boundaries is simply incorrect. We have the court had asked when the adverse possession began. I believe and the case law supports that it actually began in 1971 when Pohl and his wife started renting the property. But even if you don't want to accept that rental, possession of the property through a rental agreement is possession, we could start it in March of 1979 when Pohl purchased the property from Ed Hansen. Then that takes us to the 20-year possession of March of 1999, a month before the Williams purchased the house from Mary Jones. And then, again, the evidence, the only evidence to show that Pohl was not possessing this area, the contested area we've listed as and labeled in plaintiffs' sticks as parcel one. That's that disputed area. The first time the Williams start to do anything with that issue, again, is in 2008. We're way more than. We're nine years after this 20-year adverse possession of property actually already begins. Mr. Schmidt is correct that the only way to lose title after adverse possession comes is by adversely possessing it back for 20 years. But even if the Williamses had started to say in April of 1999 when they took over the property and said, hey, Mr. Pohl, this is our land, we're going to start putting the table scraps and the compost under the tree, even if they had started doing that in April of 1999, they wouldn't have completed until 2019 when this case was already beginning. So they've not adversely possessed back. And the best they can show is that at some point they threw some table scraps underneath the pine trees that in 2008 or 2009 they cut down. This idea that the decorative fence is a boundary is rebutted by the evidence and the testimony in court. That evidence is that, again, and we see this in the photos that were admitted, the decorative fence, and Mr. Schmidt says this is what you keep people out of. Even in the 1970s, a decorative fence can't keep people out. But it was next to the property, sorry, next to the two-lane driveway, and then there were the pine trees. This was a decorative fence. And Mr. Pohl proved by clear and convincing evidence that he possessed all of this property. Wes Myers confirmed that by clear that it showed he clearly showed this. This was in 2018. And that evidence was admitted by the court without any objection by the plaintiff as to what Mr. Pohl showed him, that he received in 1971, was shown by Ed Hansen, and then believed he purchased in 1979. For those reasons, we ask the court to reverse the trial court's ruling and grant the request for quiet title on behalf of Leon Paul Pohl. Thank you. Questions, Justice Bui? No questions. All right, thank you. Thank you so much. Appreciate your arguments. We'll consider your briefs and the exhibits. We'll take the matter under advisement and issue a decision in due course.